## SPOUTING ROCK BEACH ASSN. vs. TAX COMMISSIONERS OF STATE OF RHODE ISLAND.

### JULY 6, 1917.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

*(1)  Taxation.  Business Corporation.  Carrying on Business for Profit.*

A corporation was chartered " for the purpose of buying, selling, leasing, holding and improving real and personal property, bathing privileges and other rights, and of undertaking such measures as may promote the welfare of the city of Newport as a resort for summer residents and owners of cottages, and for the transaction of any business connected therewith and incidental thereto," with the powers and subject to the liabilities set forth in cap. 177, Gen. Laws, 1896.

The charter allowed the corporation to hold and convey real and personal property to an amount not exceeding $200,000, with provision for shares and for the transfer of such shares. The constitution created three classes — stockholders, who were owners of the property; members, who were also owners but who must be elected to membership and pay dues, etc., and subscribers, who were allowed temporary use of the social privileges. The constitution also provided for the building and conveyance of bath houses to the members, which conveyance was by deed. From its revenue derived from dues and privileges the corporation had acquired a surplus which it had invested.

*Held,* that no intention on the part of the Legislature could be found by the use of the words " a corporation carrying on business for profit " in the Tax Act, Pub. Laws, 1912, cap. 769, to impose the tax on a class of corporations different from the class described as " Business corporations " in Gen. Laws, 1896, cap. 176 (now Gen. Laws, 1909, cap. 212), but even if this were so, on the above facts the corporation was " carrying on business for profit," and the tax was properly assessed.

VINCENT and BAKER, JJ., dissenting.

CASE ON PETITIONER'S EXCEPTION to decision of Superior Court confirming a tax assessment.

STEARNS, J.  Case on the petitioner's exception to the decision of the Superior Court confirming a tax assessment made by the respondents, tax commissioners of the State of Rhode Island, against the petitioner, as a corporation carrying on business in this State for profit.

Is the petitioner a corporation carrying on business for profit within this State, within the meaning of Sec. 9,

Chap. 769, Pub. Laws 1912, or is it, as claimed by the petitioner, a corporation organized for social purposes and consequently exempt from taxation on its intangible property, called its corporate excess, as provided for by Sec. 47 of said chapter. In considering the nature of this corporation we will examine first the powers given to the corporation by its charter, and its organization thereunder, and then the acts of the corporation.

The Bailey Beach Association was incorporated by a special act of the General Assembly on February 5, 1897, and the name was changed to the Spouting Rock Beach Association by amendment May 20, 1897. The charter is as follows:

" Section 1.    Robert Goelet, Henry A. C. Taylor and I. Townsend Burden, and their associates and successors, are hereby created a corporation by the name of the BAILEY BEACH ASSOCIATION, for the purpose of buying, selling, leasing, holding and improving real and personal property, bathing privileges, and other rights and of undertaking such measures as may promote the welfare of the City of Newport as a resort for summer residents and owners of cottages, and for the transaction of any business connected therewith and incidental thereto, with all the powers and privileges, and subject to all the duties and liabilities set forth in Chapter 177 of the General Laws, and of all acts in amendment thereof and in addition thereto.

" Section 2.    The said Corporation shall have power to make and ordain such Constitution and By-Laws not repugnant to the Constitution and laws of this State and of the United States, as it may think proper, and the same to modify and repeal at pleasure, to take, hold and convey real and personal property to an amount not exceeding two hundred thousand dollars, and which real and personal property may be divided into such number of shares and of such amount as may be determined from

time to time by said Corporation and which shall be deemed personal property and be transferred as such according to such rules and conditions as the said Constitution and By-Laws of said Corporation may prescribe.

" Section 3. No stockholder shall sell or transfer his stock or any portion thereof without first giving said Corporation the right to purchase the same at the lowest price for which he is willing to sell such stock, and said Corporation may provide by By-Laws in what way such right of pre-emption shall be exercised by said Corporation.

" Section 4. This act shall take effect from and after its passage."

By the constitution of the corporation the amount of the capital stock is fixed at $200,000, divided into shares of $500 each, with stock certificates in the usual form, signed by the treasurer and secretary.

Clause 5 is as follows: " No assignee of stock in the Corporation, shall be entitled to the privileges of membership, or to a voice in the affairs of the Corporation, until he shall have been regularly elected a member, as herein provided." Without passing on the question of the legality of this particular by-law, it is apparent that the capital stock of this corporation is similar to the capital stock in the ordinary business corporation. It is personal property which can be bought and sold, is transferable and assignable, and on the decease of a stockholder the stock is the property of the estate of such member unless disposed of by will. Ownership of the stock, however, does not carry with it the privilege of membership and the social enjoyment of the use of the property.

In the constitution are the following provisions: " ' members ' shall be all persons who, having been duly elected and being Stockholders, are members of the Corporation. Every member, except the Corporators and original members, shall be elected by the Governing

Committee.'' No person shall be elected a member unless he is the owner of at least one share of stock. Every member has one vote for each share of stock held by him, at all meetings of the corporation. The control of the business of the corporation, except the sale or mortgage of its real estate, is vested in a governing committee of nine members with power to make rules and regulations which have the force of by-laws, and the by-laws of the corporation may be amended or repealed by the governing committee. The by-laws also provide for the use of the property by '' Subscribers '' who, upon payment of a subscription and on vote of the executive committee, are entitled to the privileges of members, for the time subscribed for.

In Article III of the Constitution is the following provision:

'' Each original member (or subscriber) being the owner of four shares of the capital stock, shall have the privilege at any time of having from one to four bath houses built and conveyed to him (or to such member as he may designate) by payment to the Treasurer of one hundred dollars for each house desired.

'' Said houses to be built by the Association and to be similar to those previously erected on the beach, and to be conveyed to the member by deed or grant, containing same covenants, *etc.,* as in deeds of bath houses made by Bailey and Smith, the former owners of said beach.''

Coming now to the consideration of the acts of the corporation the following facts appear from the statement of the corporation for the year 1914, which was filed by the corporation under protest:

"Total amount of authorized
capital stock .............. $200,000.00

1. Amount issued and outstanding...... 107,500.00
   Number of shares outstanding....... 215
   Par value of shares.............,... 500.00
   Average fair cash value............ 250.00
2. a. Rate of annual dividends paid....... none.
2. b. Rate of annual dividends earned..... none.
3. Amount of bonds, debentures or out-
   standing indebtedness ............ none.
4. Gross receipts within and without R. I. 7,220.35
5. Assets:

   Real Estate and im-
   provements . . ........ $93,934.14
   Cash . . . .............. 184.62
   Securities . . . .......... 11,387.10
   Profits and Loss........ 1,994.14
   _____
   $107,500.00.

   Liabilities:
   Capital Stock .......... $107,500.00
   _____

6. Assessed valuation:
   Real Estate.
   Assessed and Fair cash value,
   $41,800.00.
   Tangible Personal:
   Assessed and Fair cash value,
   $2,000.00.
7. Securities:
   Certificate of deposit, Newport Trust
   Co.. . . ......................... $3,000.00
   Seven Bonds.  C., B. & Q. R. R..... 7,387.10
   One Bond.  N. J. Zinc Co.......... 1,000.00
   _____
   $11,387.10 "

The manner of conducting the affairs of the corporation was thus described by Mr. Paine, the assistant treasurer of the corporation: (Cross-examination). "Q. 74. And from time to time since the purchase of the land, have you given rights to members by giving them also an easement in the real estate? Is that the theory of the Association? A. They purchased stock and that entitled them to bath houses or more, according to the number of shares taken. Q. 79. They assign a bathhouse from time to time, either this one or that one, or any other, from year to year, to the different members, and so long as they have a bathhouse it makes no difference? A. No. It is strange I can't remember. We do———— Q. 79. Don't you know your method of granting these privileges to members? A. Yes; we do. I was afraid that I might not state it exactly; you see the reason that I hesitate; but we do give a deed to that particular portion of the beach. Q. 80. Occupied by the bathhouse? A. Occupied by the person who purchases it. Q. 81. To the purchaser? A. To the person who———— Q. 82. Is the owner of the stock? A. Who owns the stock. The Court — A deed in writing? A. A deed in writing. Q. 83. You give a deed in writing? A. In writing. Q. 84. What does that deed convey? A. That conveys — I am stating now as well as I can recall so I shall not make any mistake — that conveys a bathhouse of such a number, we have them all numbered, it conveys that particular number to the person purchasing. The Court — Then what you give is a deed to a particular bathhouse, and the personal use of the beach; is that put on, too? A. A particular bathhouse on the beach. Q. 94. They pay $10 for each house, and the Association takes care of all the houses? A. It does. Q. 95. Now, do you charge admission to come onto the beach? A. Nobody can come on the beach unless by the invitation of a member. Q. 96. The member doesn't have to pay to come on the beach? A.

The member doesn't have to pay.   Q. 97. Suppose they have guests, what system have you, to entertain a guest? A. A member pays 25 cents for each guest that he brings in.   Q. 117. All your revenue comes from the privileges granted at the beach?   A. From the dues and privileges. Q. 118. The different privileges at the beach?   A. Yes, sir.''

The corporation owns ten acres of land on the other side of the street from the bathing beach, also another strip of land on the water side of the street near the beach.

In regard to the finances of the corporation, Mr. Paine testified as follows:   '' Q. 126. Now you have accumulated some assets which consist of a certificate of deposit of $3,000; that is in the bank at Newport; you have that in hand now?   A. In the bank at Newport.   Q. 127. You also have seven shares of C., B. & Q. property, seven bonds? A. Bonds.   Q. 128. Of the C., B. & Q.?   A. Yes, sir.   Q. 130. And you have one other bond of $1,000 face value; is that all of your assets?   A. That is all.   Q. 131. That is money assets, besides the property at the beach?   A. That is all that I am aware of.   Q. 132. What do you do with your income from this property?   A. We carry it, what there is.   Q. 133. Do you keep it in the bank?   A. Keep it in the bank; or if it amounts to anything worth while the treasurer buys some stock or something, and deposits it.   What we have on hand has been stated, I believe.   Q. 134. You try to keep your assets, these assets, the intangible assets, you try to keep them apart as a reserve fund?   A. As a reserve fund for any purpose, anything that happens.   Q. 135. You attempted to get enough revenue from different privileges at the beach, to pay all the expenses at the beach; is that correct?   A. Yes, sir. Q. 136. Have you some cash on call besides these items? A. We have not, only what little cash may be in the bank. Q. 137. A running account?   A. A running account.   Q. 138. Have you ever sold any of the real estate that the

Association originally bought? A. We have never sold any that I am aware of.''

(1)    In 1897, when this special charter was granted, corporations formed by general law were incorporated in accordance with the requirements of General Laws of 1896, Chap. 176, now Gen. Laws of 1909, Chap. 212. In said Chapter 176 it was provided: '' The several classes of corporations shall be formed according to the methods herein prescribed.''

'' Class I.— Business Corporations.''

'' Class II.— Insurance and Banking Corporations.''

'' Class III.— Literary and Scientific Corporations and Miscellaneous Corporations.''

The method provided for the creation of a social organization is distinctly set forth in Section 11: ''All libraries, lyceums, fire-engine companies, and corporations formed for religious, charitable, literary, scientific, artistic, social, musical, agricultural or sporting purposes, not organized for business purposes, and all other corporations of like nature not hereinbefore otherwise provided for, shall be created in the following manner.''

Five or more persons may associate by written articles which shall express their agreement to form a corporation, the name by which it shall be known, the purpose for which it is constituted, and the location. This agreement must be filed with the Secretary of State, and upon payment of a fee of five dollars the Secretary of State issues a certificate and the incorporators are then authorized to carry out the purpose of their agreement as a corporation.

Class I.— Business Corporations, with certain specified exceptions such as railway, quasi-public corporations, *etc.,* are formed in a similar way, with this difference that the written articles of the associates must contain a statement of the amount of capital stock and the par

value of each share, and the fee for incorporation in this class is $100.

The apparent purpose of this statute was to provide a simple method of incorporation for Class I. and Class III. corporations, without imposing upon the incorporators the burden and expense of a special application to the legislature, and also to provide for the creation of corporations at times when the legislature was not in session. This corporation at the time of its formation belonged either in Class I.— Business Corporations, or Class III.— Literary and Scientific Corporations and Miscellaneous Corporations. If the attempt had been made to incorporate under the general law under Class III. and the proposed articles of agreement had contained the statement of the purpose for which the proposed corporation was constituted, as set forth in Sec. 1 of the charter and also the provision for capital stock, it is clear that the Secretary of State could not have issued a certificate of incorporation, as for a corporation formed for social purposes not organized for business purposes. The parties would have been required to incorporate under the Class I.— Business Corporations and the fact that the corporation was created by special act does not change the nature of the corporation. The language of this charter neither expresses nor implies in any way the formation of a corporation for a social purpose. The instrument is silent on the subject of promoting the social welfare of its members. It states nothing from which it may be inferred that the corporation is constituted for any social object or purpose. The clause " and of undertaking such measures as may promote the welfare of the city of Newport as a resort for summer residents and owners of cottages " is incidental and subsidiary in this section of the charter and does not change the general business character of the powers granted. Social clubs are not organized for the purpose of buying and selling

and improving real and personal property. By general law, and without special authority of the State (Sec. 13, Chap. 176, Gen. Laws 1896, now Sec. 13, Chap. 212, Gen. Laws 1909), a social club is entitled to " take, hold, transmit and convey real and personal estate to an amount not exceeding in all one hundred thousand dollars." This power is given to such organizations as an incident to the main purpose, which is the social enjoyment of the members and to enable such social club to provide the place and means for social enjoyment. It is a much more restricted power than the power of buying and selling given by this charter.

The organization of this corporation is different in many respects from that of the ordinary social organization, in which members have equal rights of control. In this corporation the members have a share in the control, and a property interest in the corporation proportionate to their stock holdings. By purchase, gift or inheritance a person may become a stockholder and part owner of the property of the corporation without thereby becoming entitled to any enjoyment of the social privileges of members. Three classes are created by the constitution and by-laws. The stockholders who are the owners of the property, members who are also owners but who must be elected to membership, and pay an initiation fee and dues in order to enjoy the social privileges, and subscribers who are allowed temporarily the social privileges on payment therefor.

There is a distinction drawn between the stockholders the owners of the property, and the persons who may enjoy the social privileges of its use.

The actual conduct of the corporation affairs discloses the existence of a corporation doing business to a limited extent for the benefit of the stockholders and also engaged in rendering services to a particular class of persons, which latter group constitutes the social organiza-

tion. The statement, *supra,* shows that the corporation has acquired a surplus which it calls a reserve and with the surplus it has invested in bonds. The policy of the corporation apparently is to accumulate a surplus and not to divide it in the form of dividends. The result of either method is of benefit to the stockholders and the fact that no dividends have been paid is not material. It is argued that by the use of the words in the tax act " a corporation carrying on business for profit " it was the intent of the legislature to impose the tax on a class of corporations different from the class of corporations heretofore referred to as " Class I.— Business Corporations." We are unable to discover any such intention after an examination of the statutes in question, but even if this contention was sound, in this case the facts show that the corporation has carried on business for profit, and that thus it comes within the letter of the law as well as its spirit. Granting that the amount of business done is less than might have been done, and that the gain is not large, this does not change the character of the corporate activity.

The question in this case is one which involves the interpretation of the laws of this State and more particularly the provisions of Chap. 769, enacted in 1912. No cases have been called to our attention by counsel which have any decisive bearing on the question involved.

In the case of *R. I. Hospital Trust Co.* v. *Rhodes,* 37 R. I. 141, decided in 1914, this court has defined the meaning of the phrase " carrying on business " and discussed the general meaning of the act in question. The precise issue in this case, however, was not involved in the decision of that case. In consideration of the intent of the original incorporators, as shown by the application for and acceptance of the charter, and the character of the organization effected and the nature and results of the corporation acts, we are of the opinion that the petitioner is a

corporation " carrying on business for profit " and consequently that the tax appealed from was properly assessed.

The petitioner's exception is overruled and the case is remitted to Superior Court.

Baker, J., dissenting. As I do not agree with the conclusion reached in the opinion of the majority of the court, I hereby state the grounds of my dissent.

The petition was filed in the Superior Court in accordance with the provisions of Section 18 of Chapter 769 of the Public Laws, praying for relief from a tax assessed against the petitioner under Section 12 of said act upon its corporate excess for the years 1912, 1913 and 1914. The petition was denied, the petitioner excepted and the case is before us on its bill of exceptions.

Chapter 769 in Sections 9, 10 and 11 provides for the assessment of a tax of that portion of the intangible property of certain corporations and joint stock companies called their corporate excess. This expression " corporate excess " was a new designation and classification of property. The classification of corporations liable to this tax is effected by the use of the language " every corporation . . . carrying on business for profit in this state."

Two questions arise: First, What is the proper interpretation of the words " carrying on business for profit? " Second, Was the Spouting Rock Beach Association, a corporation, " carrying on business for profit in this State " in the years 1912, 1913 and 1914?

It is to be noted that the language of Section 9 aforesaid creates a new classification of corporations hitherto not known to our statutes. When Chapter 769 was passed in 1912, Chapter 212 of the General Laws was in force which classifies corporations into three classes: I.— Business Corporations; II.— Insurance and Banking

Corporations; III.— Literary and Scientific Corpora-
tions and Miscellaneous Corporations.   If the General
Assembly intended by said Section 9 to make Class I.—
Business Corporations as such subject to the tax for cor-
porate excess, it would have been both easy and natural
to adopt the existing and well-known classification, includ-
ing with them also similar business corporations incor-
porated under special charters.   The natural inference is
that the legislature in not adopting the existing classifica-
tion intended and did make a new classification of cor-
porations for the purpose of determining their liability
to be taxed for corporate excess.   This view is supported
by the caption preceding Section 9, which is " Taxation
of Manufacturing, Mercantile and Miscellaneous Cor-
porations."   The petitioner is certainly neither a manu-
facturing nor a mercantile corporation and, if taxable,
under Section 9 it must be under the designation Miscel-
laneous Corporations.   But under Chapter 212, Miscel-
laneous Corporations is placed under Class III.   Ob-
viously the words in the two chapters are used with dif-
ferent meanings, thus further indicating an intentional
departure from the classifications of Chapter 212.   More-
over the classification in the two chapters shows another
significant and basic difference.   The classification under
Chapter 212 is (speaking in a general way) based upon
the character of the dissimilar powers given the dif-
ferent corporations.   The class created by Section 9 rests
upon the actual activities of the corporation, coupled with
and modified by the words " for profit " as expressive
of the purpose of such activities.   The necessary inquiry
as to the latter class is, What is the corporation doing
for the purpose of gain? and not, Do its corporate powers
make it a business corporation?   In *R. I. Hospital Trust
Co.* v. *Rhodes,* 37 R. I. 141, on page 149, this court stated
that the words " every corporation   .   .   .   carrying on
business for profit in this state " effected a general classi-

fication of corporations liable to a tax for corporate excess, and held that in addition to the corporations specially excepted from such taxation by Chapter 769 (that is, business corporations of certain kinds and all corporations in Class III. under Chapter 212), " By implication . . . all corporations not ' carrying on business for profit in this state ' escape liability for taxation for ' corporate excess.' " In other words, it is held that other business corporations other than those specified may be exempt from taxation for corporate excess. It may be readily agreed in the present case that the petitioner, judged by the principles of classification established in Chapter 212 is a business corporation. But that would aid little, if at all, in determining the question now raised, which is to be answered by means of the new classification instituted for the purpose of determining liability for taxation for corporate excess. The rule as to the interpretation of statutes is clearly stated as follows in 26 Am. & Eng. Ency. of Law, 598: " (1) *General Statement.*— In order to ascertain the legislative intention, the primary rule is that a statute is to receive that meaning which the ordinary reading of its language warrants, words not technical being taken in their ordinary, familiar acceptation, with regard to their general and popular use; and the meaning thus arrived at must be adopted when it involves no absurdity, if from a view of the whole law and other laws *in pari materia* no different legislative intent is apparent.

" (2) *Results, Motives and Policy Not Considered.*— If the language is clear and admits but one meaning, the legislature should be intended to mean what it has plainly expressed, and there is no room for construction. The plain and sound principle is to declare *ita lex scripta est,* although so understood the statute leads to absurd and mischievous results, or to consequences not contemplated by the legislature; for courts are not to inquire as to the

motive of the legislature, nor to depart from a meaning clearly conveyed in unambiguous words, because the statute, as literally understood, appears to lead to unwise consequences or to contravene public policy. *A fortiori,* there can be no departure from the terms of the statute where no absurdity or inconvenience will follow from a literal interpretation."

The meaning of the words " carrying on business for profit " is so plain as to leave no room for construction. If we substitute for them the expression " prosecuting or conducting business for the purpose of pecuniary gain " we do not explain the original expression but simply paraphrase it. In *R. I. Hospital Trust Co.* v. *Rhodes, supra,* the question considered was whether the United Traction and Electric Co. was " carrying on business for profit in this State." Its powers under its charter were numerous, broad and comprehensive. It clearly was a business corporation. In considering the question of its liability to this peculiar form of taxation, this court took into account only the exercise of its corporate powers actually employed, and held that the exercise of any of its corporate powers in this State constituted the " carrying on of business." It also recognized the fact that the inquiry involved the ascertaining of whether the business was conducted for profit, when it said on page 147 : " It is certainly idle to suggest that the activities of the company by whatever name they may be characterized were not carried on ' for profit.' The stockholders received eight hundred and fifty thousand dollars a year on its invested capital and the only reasonable inference is that they were maintaining the corporation and carrying on its work for the ' profit ' or gain afforded thereby and not for pleasure or charity."

Under the authority of the case quoted the Spouting Rock Beach Association is certainly carrying on business

33

in this State.    The only question as affecting its liability to be taxed for corporate excess is as to whether it is carrying on business '' for profit.''    The argument *ab inconvenienti* as related to the difficulty of the tax commissioners ascertaining whether a business is carried on for profit should be given little weight in view of the' rule of construction already quoted.    Moreover, chapter 769 apparently contemplates investigation along this line in fixing the amount of corporate excess, as may be seen by a careful examination of the provisions of sections 9, 10 and 11 of that chapter.

I think the opinion of the majority inaccurately states the questions involved and also the claim of the petitioner in saying, '' Or is it, as claimed by the petitioner, a corporation organized for social purposes and consequently exempt from taxation on its intangible property, called its corporate excess, as provided for by Sec. 47 of said chapter? ''. I fail to find any claim of exemption under section 47.    On the contrary, the claim is that the petitioning corporation is not in the class created by the words '' carrying on business . . . *for profit.*''

For the reasons above stated, I am of the opinion that the words '' carrying on business . . . for profit '' should receive the meaning which the words have when '' taken in their ordinary familiar acceptation, with regard to their general and popular use.''

The remaining question is one of fact.    As the majority opinion quotes the act of incorporation in full and portions of the constitution and by-laws, states the amount of capital stock authorized and the par value of the shares of stock, it is not necessary to re-state these matters.    The statement of the corporation for 1914 filed with the Tax Commissioners shows its assets and liabilities to be as follows:

*Assets.*

| | |
|---|---:|
| Real estate and improvements ........... | $93,934 14 |
| Cash ...................................... | 184 62 |
| Securities ............................... | 11,387 10 |
| Profits and loss ......................... | 1,994 14 |
| | $107,500 00 |

*Liabilities.*

| | |
|---|---:|
| Capital stock ............................ | $107,500 00 |

Respecting this statement, Frederick H. Paine, assistant treasurer and assistant secretary, testified in his direct examination: " Q. 43. That was all you held to represent the $107,500 worth of capital stock was that real estate and those securities? A. That is all; " and in cross-examination: " Q. 68. Is the real estate and improvements thereon carried on your books as to that amount and returned to the tax assessors $93,934.14? A. Everything here was taken from the books. Q. 69. It was taken from the books? A. Yes, sir. Q. 70. Then they have actually spent for land and for improvements on the land something over $93,000. Is that correct? A. That is correct, as far as I can tell. Q. 136. Have you some cash on call besides these items? A. We have not, only what little cash may be in the bank. Q. 137. A running account? A. A running account." Just preceding these last two questions the witness had been interrogated as to the items grouped as " securities " in the statement. The statement in evidence shows that no dividends had been paid and none earned. It is obvious from this that the item " profits and loss $1,994.14 " represents loss, and that the corporation in the seventeen years of its existence had not been carrying on business *at* a profit. It is to be reasonably inferred also that the item " securities $11,387.10 " represents capital,

probably arising from the sale and issuance of capital stock since the purchase of the land and the making of the improvements.

It may be agreed, however, that the fact that the business had been conducted at a loss does not in itself establish the further fact that it was not conducted for profit. Mr. Paine testified in reply to the question, " Is the corporation operated for profit? " A. " It is not." This is, of course, not conclusive, but as the opinion of a well-informed, though presumably an interested witness, it is to be considered. Speaking in general terms the petitioner exercised its corporate powers by buying, holding and improving real estate and thereafter leasing bathing privileges. These bathing privileges it has conducted in the form of a club organization, with the customary restrictions as to membership and the use of club privileges. In this respect its activities have the characteristics of those of a social club, peculiar in the respect that they are conducted on a beach and during the three or four months of each year when in this region out-of-door bathing is ordinarily indulged in. This is the only business carried on by the corporation during the three years when the taxes in question were assessed. The only revenue or income of the corporation was the dividends on its securities, the annual dues of $20 due from each of its seventy-one members, the annual charge of $10 on each bathing house belonging to members (a member being entitled to own one bath house for each share held by him), the dues receivable from persons temporarily admitted to the club privileges of the corporation, called subscribers, the amount of which is not in evidence, and the sums received from members paying twenty-five cents for each guest brought in by them. The social character of the petitioner's activities, and their purposes as being similar in kind to those of a purely social club, are clearly evidenced by the constitution and by-laws. The total

amount of revenue is not shown. There is an item in the statement for 1914 of total gross receipts of $7,220.25, but this amount may contain proceeds of the sale of stock during that period. The fact that the largest possible annual revenue from membership dues and the charges on the 215 bath houses which the members are entitled to have (one for each share) is $3,570 makes it probable that such receipts contain such proceeds of sale. Inasmuch as the stockholders are shown to have paid $500 a share for their stock, and to have contributed annually approximately at least the amount of $3,500 for the upkeep and management of the corporation and its property, and never to have received a dividend on their stock, it is difficult to reasonably conclude that they acquired and have continued to hold the stock of this corporation as an investment, or for any other purpose than the enjoyment of the bathing and other privileges and pleasures afforded them as members. This is plainly apparent from the fact that thirty-seven of the seventy-one members each hold four shares of stock and upwards, a large and controlling majority of the stock. And if we consider the purposes of the present activities of the corporation as shown in its constitution and by-laws, and the character of these activities themselves, and the further fact that the corporation by the continued maintenance of these activities for seventeen years has brought to itself no pecuniary profit, but the contrary, it is equally difficult to infer or believe that the corporation has been " carrying on business for profit." I am of the opinion that on the contrary it very clearly appears that the petitioner has not been " carrying on business in this state for profit.".

The Presiding Justice of the Superior Court in his oral decision at the close of the testimony after saying that the question was " somewhat close " said " I think they are doing business to make money and if they go on

making a profit on the enterprise . . . if an association of this kind for any reason elected to dissolve, and had a big surplus in its treasury, every stockholder would get the benefit of it, and there would be a profit there.'' I think he misinterpreted the item '' Securities '' as indicating a surplus, and from this that the corporation had made and was making a profit in the conduct of its business, and, therefore, concluded that the business was conducted to make money.   For the same reason I think that the majority opinion is in error in stating that the petitioner has '' acquired a surplus.''   This impression of the existence of a surplus was perhaps derived from the cross-examination of Mr. Paine (questions 126 to 135, inclusive, quoted in the majority opinion).   The inquiry related to the different items of the securities.   After naming them, a part of Q. 130 is, '' Is that all your assets? A. That is all that I am aware of.   Q. 132. What do you do with your income from this property?   A. We carry it, what there is.''   The word income from its construction plainly refers to the income from these securities. Question 135 and its answer clearly show this.   His answer to Q. 134 that these assets are kept '' as a reserve fund for any purpose, anything that happens,'' might aid the impression of a surplus.   But as hereinbefore pointed out the statement filed with the tax commissioners shows beyond question that the corporation has accumulated no surplus in excess of its liabilities.

As has already been stated, my opinion is that the evidence clearly shows that no pecuniary profit has resulted from the business and that there is no surplus, and therefore that the conclusion that the corporation was '' doing business to make money '' is without support.

Accordingly I am of the opinion that the decision of the Presiding Justice denying the petitioner relief was clearly an error, and that the exception should be sus-

tained, and the case remitted to the Superior Court for a new trial.

Vincent, J., concurs in dissenting opinion of Baker, J.

*Sheffield & Harvey,* for petitioner.
*Herbert A. Rice,* for respondents.
*James A. Tillinghast,* of counsel.